UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| T.O, | |
| Plaintiff, | |
| v. | CIVIL ACTION FILE NO.: |
| JANKI MOTEL, INC., | _____ |
| Defendant. | |

## COMPLAINT

COMES NOW Plaintiff in the above-styled action and files her Complaint as follows:

## 1.

T.O. is a victim of sex trafficking at the America's Best Value Inn located at 2574 Candler Road, Decatur, Georgia ("ABVI"). T.O. was trafficked at the motel as a minor, when she was 16 years old, in 2014. Given the nature of the case, Plaintiff T.O. is identified in this complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel will disclose the full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

---

[1] Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include minor sex trafficking, are intimate and personal in nature, as well as for T.O.'s own personal safety.

2.

Defendant Janki Motel, Inc. is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Milan Patel, 1155 Morgan Garner Dr., Lilburn, Georgia 30047.

3.

Defendant Janki Motel, Inc. has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant Janki Motel, Inc.

5.

At all times herein, Defendant owned, operated, maintained, controlled, managed, or was responsible for securing the ABVI, from which it benefitted financially.

6.

Defendant knew of the rampant sex trafficking and prostitution at the motel for years, before, during, and after Plaintiff's trafficking. Defendant knew because:

(a)    Defendant knew the facts of this specific Plaintiff while she was trafficked for sex at the motel;

(b)    Its employees knew of and permitted sex trafficking and prostitution to occur at the motel;

2

(c)    Defendant knew the facts of multiple other sex trafficking victims at the motel before, during, and after Plaintiff;

(d)    Defendant knew about frequent and ongoing similar crime occurring at the motel;

(e)    Defendant knew about the reports of motel guests regarding sex trafficking and prostitution-related activities;

(f)    Defendant had knowledge of sex trafficking generally in the Atlanta area and at this motel specifically.

7.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is *criminal* sex trafficking under federal and Georgia law, whether the minor had a trafficker/pimp and does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1).

8.

Sex trafficking and prostitution were common occurrences at the ABVI and Defendant chose to ignore, allow, condone, facilitate, support, or permit such

activity at the motel. Defendant is liable to Plaintiff for its actions and failure to act. Defendant's liability to Plaintiff is straightforward:

(a)    The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a) provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person **_knew or should have known_** has engaged in an act in violation of" the TVPRA. Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the motel, Defendant (i) rented rooms to Plaintiff's traffickers so Plaintiff could be violently sold for sex at the motel, (ii) collected fees for rental of those rooms, and (iii) did so despite what it knew or should have known about Plaintiff being a victim of sex trafficking at the motel. As a result, Defendant is liable to Plaintiff for her damages under the TVPRA.

(b)    The ABVI constituted a public nuisance under Georgia law because the motel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the motel, including rampant prostitution, crimes against women, dangerous illegal activity, drugs,

violence, harboring missing and runaway underage girls, harboring wanted felons, sex crimes, and sex trafficking. As a direct result of this nuisance, Plaintiff was sold for sex at the ABVI, causing her substantial harm.

(c)     Because T.O. was a minor when she was trafficked at the ABVI, and because Defendant knowingly facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to T.O. for the substantive violation of 18 U.S.C. § 1591.

9.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the ABVI.

## I.    T.O.'s Trafficking at the ABVI

10.

In March 2014, when she was 16 years old, T.O. was forcibly sold for sex at the ABVI.

11.

T.O. was trafficked with other girls at the ABVI. At times, she shared a room with two other victims. And they often appeared around the motel in skimpy clothes to attract buyers.

12.

T.O. was sex trafficked on the backside of the ABVI property, where sex trafficking victims were intentionally placed by Defendant to keep them out of public view. By intentionally placing T.O. in the rear of the motel, Defendant concealed T.O.'s traffickers' operation and minimized their risk of detection.

13.

While T.O. was trafficked for sex at the ABVI, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, loitering, soliciting male patrons, and monitoring and control of T.O. by her traffickers.

14.

T.O.'s traffickers were frequently violent with her at Defendant's hotel, leaving her with visible signs of abuse, including bruising.

15.

Defendant knew or should have known that T.O was being trafficked based on these signs and behaviors.

16.

T.O. was sold for sex to roughly 8 men per day while she was at the ABVI. The other victims in her room would also see anywhere from 6 to 10 buyers per day. Thus, over 20 men visited the single room shared by the victims each day to purchase sex throughout the several months T.O. was trafficked at the ABVI. Defendant knew or should have known that the high number of older men visiting the room each day was clearly indicative of T.O.'s sex trafficking at the motel.

17.

While at the ABVI, T.O. was made to engage in commercial sex acts she did not feel comfortable with. On at least one occasion, she was forced to allow a sex buyer to perform oral sex on her, despite her objections.

18.

While one victim was being bought for sex with a buyer inside the room, the traffickers and other victims left the room and either lingered around the hotel or went to a store located across the street.

19.

In addition to advertising the child on Backpage.com, T.O.'s traffickers forced her to walk the street to pick up dates. During these times, T.O. was dressed in revealing clothing. Her appearance made it clear that she was being sold for sex.

20.

Employees at the ABVI accommodated and were familiar with T.O.'s traffickers. When T.O.'s traffickers checked into the ABVI, Defendant did not require them to present any form of identification.

21.

Housekeeping came to the room T.O. was trafficked in and found trash cans full of condoms and other paraphernalia. Defendant knew or should have known that these signs, among others, were signs of T.O.'s trafficking at the ABVI.

22.

On a regular basis, Defendant's employees knowingly removed and disposed of evidence of trafficking from the trafficker's room. This destruction of evidence was carried out in coordination with or for the benefit of the traffickers, with the effect of hindering any potential investigation into T.O.'s trafficking.

23.

T.O. went to the front office on multiple occasions to pay for the room in cash or request towels. Every time she went to the front office, she was accompanied by another minor who was also a victim of sex trafficking.

24.

Hotel employees also knowingly provided rooms to T.O.'s traffickers on credit, allowing payment at a later time. When T.O.'s traffickers did not have the money for the day's room, the hotel allowed the traffickers to stay in their room without paying for it, loaning the room to T.O.'s traffickers to sell the child victims first, and then using the proceeds to cover the cost of the room afterward. In short, the hotel loaned its rooms out to traffickers, including specifically T.O.'s traffickers, so the hotel could be paid after some illegal money was raised. Defendant knew or should have known of their policy to loan its rooms to traffickers, including T.O.'s, in order to generate revenue from traffickers who found themselves short of funds.

25.

When T.O. was trafficked at the ABVI, she saw many other girls and women who were obviously being sold for sex at the motel. These women and children wore revealing clothing throughout the motel and parking lot and there was a constant stream of traffic throughout the day of men with no luggage visiting the motel rooms of these women and children for short periods of time before leaving and being

followed by other anonymous men.

26.

Often, these women and children could be seen loitering around the motel soliciting buyers of sex at the motel. Defendant knew or should have known that these were signs of sex trafficking at their motel.

27.

Defendant had a policy to allow and facilitate sex trafficking at the ABVI, including the sex trafficking of T.O. Defendant enacted that policy by, among other things, agreeing to house T.O.'s traffickers and their trafficking ventures, their associates, and victims. Defendant knowingly placed T.O. on the backside of the motel, concealing her sex trafficking and protecting her traffickers from detection. And Defendant knowingly and actively disposed of and destroyed physical evidence of T.O.'s sex trafficking for her traffickers, protecting them from potential investigation by the police.

28.

T.O.'s traffickers were ultimately arrested and found guilty of trafficking of person for sexual servitude, pimping for person under 18, rape, and interference with custody.

## II.    Defendant's Involvement with Other Trafficking Victims at the ABVI

29.

Defendant had a policy not to call the police regarding known sex trafficking at the motel. Defendant enacted this policy in the case of T.O., as well as other sex trafficking victims.

30.

One victim, A.D., whose declaration is attached to this complaint[2], was also trafficked at Defendant's motel for several years. Beginning in 2013, A.D. lived on the property for more than a year and continued to return for extended stays lasting several months at a time until about 2015. During this period, A.D. was sold for sex to approximately 5 to 10 men per day while staying at the motel.

31.

A.D. stated that the owner of the motel, Milan Patel, was fully aware of the sex trafficking and prostitution activity occurring at the motel. Mr. Patel frequently asked her detailed questions about the prostitution and sex trafficking at the motel, including what types of men were purchasing sex, how many sex buyers she saw each day, and how much money she was making.

---

[2] *See* Ex. 1, A.D. Declaration.

32.

The motel intentionally segregated guests based on their involvement in sex trafficking and prostitution. According to A.D., Mr. Patel told her that because she was "selling sex," he wanted to move her to a room at the back of the building—and he did so. A.D. explained that the front of the motel was reserved for so-called "regular" guests, while individuals being sold for sex were intentionally placed in the back. Defendant knew or should have known of its policy and practice to conceal sex trafficking from public view by housing sex trafficking victims at the back of the property, thereby allowing sex trafficking to operate without disruption.

33.

On nights when A.D. did not see any buyers, Mr. Patel would approach her and comment on it, saying things like. "You didn't have company last night?"—a clear reference to men coming to the motel to purchase A.D. for sex.

34.

When A.D. was unable to pay for a room, Mrs. Patel would inquire about when A.D. was expecting her next "company," a clear reference to sex buyers. The motel permitted A.D. to remain in the room without payment, knowingly advancing the cost of the room in anticipation that it would be repaid with proceeds from her trafficking. Defendant knew or should have known of its policy and practice of advancing room credit in exchange for proceeds from sex trafficking.

35.

On one occasion in 2013, A.D. was violently robbed in her room by two men and a woman who physically assaulted her and stole her belongings. A.D. fled the room in her underwear, visibly beaten and bruised, and ran into the motel office to seek help. Mr. Patel reviewed the surveillance footage and still refused to contact the police. Instead, he instructed A.D. to return to her room.

36.

According to A.D., police officers would occasionally drive through and park on the edge of the property. When this occurred, Mr. Patel would approach the patrol vehicles and demand that officers leave the property, refusing to allow them to monitor the premises. Defendant knew or should have known of its policy and practice of keeping law enforcement off the ABVI property to prevent interference with the ongoing sex trafficking taking place at the motel.

37.

A.D. saw 10 or more other people being sold for sex at the same time at the ABVI. They would walk the property to pick up dates.

38.

A.D. estimates that there were at least 50 to 100 men who came to the ABVI each day to purchase sex. The sex buyers would honk their horns upon arrival, prompting girls to come out of their rooms dressed in skimpy clothing so the buyer

could pick out which girl he wanted to buy for sex. A.D. described the scene as being "like a drive-through sex operation."

39.

Another victim, C.L., who was only 17 years old when she was first trafficked at the ABVI in 2009, was also sex trafficked at the motel.

40.

C.L. reports that while she was being sex trafficked at the ABVI, Mr. Patel repeatedly purchased her for sex. Specifically, Mr. Patel would exchange sex with this victim to cover the cost of her room.

41.

Mr. Patel began following this victim around the ABVI property. He would appear uninvited in her room and point to his genitals, a sign that he expected sex.

42.

Once, C.L. and her trafficker were sitting in his truck in the parking lot of the ABVI when an argument broke out between them. During the altercation, C.L. jumped out of the vehicle and ran into the front office. C.L.'s trafficker followed her inside and forcefully placed his arm around her in an effort to regain control and force C.L. back to the truck. C.L. was yelling and pleading for the employee to call the police. The employee refused to do so. C.L.'s trafficker then escorted C.L. back to the truck and forced her inside.

### III.    Defendant's Knowledge of Prior Crime at the ABVI

43.

The ABVI was well known for crime, prostitution, and sex trafficking. Defendant had actual and constructive knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

44.

Before T.O.'s sex trafficking at the ABVI, prostitution and sex trafficking were frequent occurrences at the hotel, obvious to employees and guests.

45.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why T.O.'s sex traffickers brought her to the ABVI to be sold for sex.

46.

Defendant maintained a policy or practice of refraining from contacting law enforcement, even when presented with clear indications of criminal activity, including sex trafficking occurring on its premises. This policy was furthered and reinforced by the actions of Defendant's employees, who, rather than reporting suspicious activities to authorities, took active steps to conceal it. These steps included intentionally housing sex trafficking victims, including T.O., on the backside of the motel to keep them out of public view, refusing to call the police when victims

sought help, and instructing law enforcement officers to leave the property when they attempted to monitor activity. This practice created a safe environment for traffickers, including T.O.'s traffickers, to exploit their victims without fear of detection or interference.

47.

Before, during, and after T.O.'s sex trafficking at the ABVI, patrons frequently saw women who were being sold for sex at the motel loitering outside, soliciting men for sex, and observed the heavy foot traffic surrounding the rooms where sex and drugs were being sold at the motel.[3]

48.

Defendant knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the ABVI prior to T.O.'s sex trafficking there.

49.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the ABVI. Much of this activity either alerted or should have alerted Defendant to the motel's rampant sex trafficking, prostitution, and sex crime problem. As mere examples, among many other instances, the police responded to the following incidents at the motel before, during, and after Plaintiff's trafficking:

---

[3] *See, e.g.,* Ex. 1, A.D. Declaration; Ex. 2, K.M. Declaration.

(1) On **June 29, 2009**, a female reported that she was **sexually assaulted** at the ABVI.

(2) On **May 12, 2011**, a male victim reported being set up for a paid sex encounter at the ABVI, then assaulted and robbed by two unknown men after refusing to pay.

(3) On **October 23, 2011**, a victim reported being **sexually assaulted** at the ABVI.

(4) On **June 4, 2012**, a female reported being slapped and choked by a male suspect at the ABVI after refusing to "do anything" with him.

(5) On **February 25, 2014**, a male victim reported that a woman he met on the dating site POF—a website commonly used to arrange paid sex—stole his wallet, phone, pants, and keys after spending the night with him at the ABVI.

(6) On **June 19, 2014**, Dekalb County Police Department's Vice Unit conducted a police operation targeting females that engaged in prostitution and arrested a female for **prostitution**.

(7) On **November 4, 2015**, a woman was issued a criminal trespass warning after she kicked a hotel room door at the ABVI during a dispute over a $20 sex-for-money arrangement that was not honored.

(8) On **November 28, 2015**, a woman reported being assaulted at the ABVI by a man who became angry when she refused to have sex with him.

(9) On **February 4, 2017**, a man reported being robbed at knifepoint at the ABVI after letting in a woman he hoped was a prostitute, who later returned with two men.

(10) On **November 7, 2017**, Dekalb County Police Department's Vice Unit conducted an operation and arrested a female for **prostitution**.

(11) On **November 11, 2017**, Dekalb County Police Department Vice Unit conducted a prostitution operation at the ABVI and arrested a female for **prostitution** and **keeping a place for prostitution**.

50.

Defendant had actual or constructive knowledge of publicly available online reviews of the ABVI reporting prostitution and crime occurring at the hotel, including the following:

(1)    July 2012, from priceline.com:

"The hotel reminds me of a dirty motel that rents room by the hour!"

(2)    September 2013, from priceline.com

"The surrounding area . . . was undesirable, lots of people walking the streets at all times."

(3)     July 21, 2014, from expedia.com:

" . . . they were selling drugs there and prostitution Going on there."

(4)     August 2015, from tripadvisor.com:

"**Drug and prostitution ring**

When we got back to the motel after dinner a police officer outside informed us of the drug and prostitution issue the motel was having . . . "

(5)     January 2016, from tripadvisor.com:

"I know this has to be a place that rents rooms out to a lot of drug abusers and prostitutes."

(6)     September 2016, from tripadvisor.com:

"I immediately began being harassed by men hanging out in the parking lot. This happened any time I left the room. . . . I even had one man flash a few fifties at me and try to "buy" me, and one that followed me from the stairs to the front office."

(7)     January 2017, from tripadvisor.com:

"This place didn't feel safe at all it look like, it is prostitute infested drug-infested."

## IV.    Defendant's Knowledge of Sex Trafficking Generally

51.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Protection

Victims Act in 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

52.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that crime was prevalent in the city, including at the ABVI. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[4] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting motel rooms used for the trafficking of T.O.

---

[4] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited June 6, 2025); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited June 6, 2025).

20

53.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[5] and as "the number one city for child sex trafficking."[6]

54.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

55.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving motels and hotels reported sex trafficking, and another 2.6 percent reported a

---

[5] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited June 6, 2025).

[6] *Id.*

combination of sex and labor trafficking.[7] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[8] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[9] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[10]

56.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in or around motels,[11] and that the industry had been

---

[7] National Human Trafficking Hotline, *National Hotline Cases Occurring in Motels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Motel%20and%20Motel%20Topical.pdf (last visited Sept. 9, 2021).

[8] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[9] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Motels-and-Motels.pdf (last visited Sept. 9, 2024).

[10] *Id.* at 23.

[11] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983].

warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[12]

57.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[13]

58.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels and hotels can take:

(a)     establish corporate policy and procedures against sexual exploitation of children;

(b)     train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)     include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

---

[12] *Id.* at 19.

[13] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited June 6, 2025).

(d)    provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)    support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)    report annually on the company's implementation of Code-related activities.

59.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels and hotels the tools to address the scourge of sex trafficking at motels.

60.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help motels and hotels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and hotels, such as:

(g)    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(h)    persons who lack freedom of movement or are constantly monitored;

(i)    persons who have no control over or possession of money or ID;

(j)     persons who dress inappropriately for their age or have lower quality cloth-

ing compared to others in their party;

(k)     requests for room or housekeeping services (additional towels, new linens,

etc.), but denial of motel staff entry into the room;

(l)     the presence of multiple computers, cell phones, pagers, credit card swip-

ers, or other technology in the room;

(m)     extended stay with few or no personal possessions in the room;

(n)     excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lo-

tion, etc.);

(o)     the same person reserves multiple rooms;

(p)     a room is rented hourly, less than a day, or for an atypical extended stay;

(q)     attempts to sell items to or beg from patrons or staff;

(r)     cars in the parking lot regularly parked backward, so the license plates are

not visible; and

(s)     loitering and solicitation of male patrons.

### COUNT I
### STATUTORY LIABILITY: SEX TRAFFICKING
### 18 U.S.C. § 1595

61.

Plaintiff incorporates the paragraphs above as if fully restated herein.

62.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

63.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the ABVI, including the revenue generated for the rooms in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the ABVI, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room rental fees.

64.

Defendant participated in a motel venture and knew or should have known that their operation of the motel violated the TVPRA by harboring and maintaining Plaintiff so that she could be sold for sex at the ABVI.

65.

The venture in which Defendant participated was in or affecting interstate commerce.

66.

Defendant knew or should have known the venture engaged in acts in

violation of the TVPRA because Defendant's agents, employees, and representatives, participated in Plaintiff's sex trafficking at the ABVI. Defendant should have known of this participation.

67.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the motel before and while Plaintiff was trafficked for sex at the ABVI.

68.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

69.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

70.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

71.

Defendant is jointly and severally liable for damages arising from the indivisible injuries it caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## COUNT II - NUISANCE

72.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

73.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

74.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

75.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does

not participate causes special damage to an individual, such special damage shall give a right of action."

76.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges[14] shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

77.

The ABVI's history of rampant crime and illegal sex activity created a spill-over effect that led to other crime occurring in the surrounding area.

78.

The ABVI caused or contributed to a blighting effect on the surrounding community, so that the ABVI negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the ABVI,

---

[14] O.C.G.A. § 41-3-1 defines "sexually related charges" to mean trafficking a person for sexual servitude, public indecency, prostitution, keeping a place of prostitution, pimping, pandering, or masturbation for hire.

although the effects on each person may have varied.

79.

The illegal prostitution and sex trafficking nuisance occurring at the ABVI had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

80.

Defendant controlled the nuisance because it controlled the motel. It could have *not* allowed the rampant prostitution and sex trafficking at the ABVI, including Plaintiff's sex trafficking, but instead it chose to facilitate, conceal, and participate in that activity so that they could reap the ill-gotten profits of Plaintiff, and others, suffering.

81.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the ABVI caused special damages to Plaintiff, as she was a victim of sex trafficking at Defendant's nuisance motel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

82.

The ABVI constituted a nuisance per se under Georgia law because the motel knowingly and/or negligently allowed and facilitated illegal sexually related crimes to occur at the motel including rampant prostitution, pandering, pimping, and sex trafficking. In other words, the ABVI was a "lewd house."

83.

Prior to and following the minor sex trafficking of Plaintiff, Defendant failed to act on its knowledge of prior prostitution and sex trafficking, and failed to act to correct, prevent, or warn of the prostitution and sex trafficking occurring at the motel, and the dangerous environment created on the property. Defendant's failure to take appropriate action to remedy or reduce the danger to the public, including Plaintiff, allowed the dangerous environment at the ABVI to continue to exist unabated, thereby creating a nuisance that continues to this day.

84.

Plaintiff was directly harmed as a result of the ABVI being a nuisance motel that permitted illegal sexual activity to occur there.

85.

Defendant is liable for their public nuisance by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant had

express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## COUNT III
## STATUTORY LIABILITY: MASHA'S LAW 18 U.S.C. § 2255

86.

Plaintiff incorporates the paragraphs above, as if fully set forth herein.

87.

As described above, Defendant directly participated in the minor sex trafficking of T.O. by knowingly assisting and facilitating T.O.'s sex trafficking at the ABVI because their staff openly participated in T.O.'s trafficking, *supra* paragraphs 10–42. Thus, Defendant committed the predicate offense of a violation of 18 U.S.C. § 1591 as to T.O.

88.

T.O. was under the age of 18 when she was trafficked at the ABVI.

89.

T.O. was the victim of violations of 18 U.S.C. § 1591 at the ABVI.

90.

T.O. suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

91.

Defendant knew or recklessly disregarded that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause T.O. to engage in commercial sex acts at the ABVI.

92.

Defendant knowingly harbored, provided, obtained and maintained T.O. at the ABVI by providing them and their traffickers rooms in the hotels, extra illegal services, in and affecting interstate commerce.

93.

Defendant knowingly benefitted financially or by receiving anything of value, from participation in the ventures of renting rooms to T.O.'s sex traffickers who violated 18 U.S.C. § 1591 as to T.O.

94.

Thus, as described herein, Defendant is jointly and severally liable to T.O. for compensatory and punitive damages, in an amount to be determined at trial.

## **DAMAGES**

95.

Plaintiff incorporates the paragraphs above as if fully restated herein.

96.

As a proximate and foreseeable result of Defendant's violations of the TVPRA, Masha's Law, and Georgia law, Plaintiff sustained personal injuries,

mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a)   Personal injuries;

b)   Past, present and future conscious pain and suffering;

c)   Loss of enjoyment of life;

d)   Medical expenses;

e)   Mental anguish and emotional distress;

f)   All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g)   Consequential damages to be proven at trial.

97.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and

showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

98.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to them and against Defendant for the following:

a)    Process issued as provided by law;

b)    Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

c)    Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

d)    Plaintiff be awarded a trial by jury; and

e)    Plaintiff have such other relief as this Court deems just and appropriate

under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on June 6, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 236-9784 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile